Filed 3/20/26  In re R.B. CA2/5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re R.B., a Person Coming Under the Juvenile Court Law. | B347734 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>R.B. et al.,<br><br>        Defendants and Appellants. | (Los Angeles County Super. Ct. No. 18CCJP01602E) |

APPEAL from orders of the Superior Court of Los Angeles County, Sally Espinoza, Judge.  Affirmed.

Anne E. Fragasso, under appointment by the Court of Appeal, for Defendant and Appellant R.B.

John L. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant L.C.

Office of the County Counsel, Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Navid Nakhjavani, Principal Deputy County Counsel, for Plaintiff and Respondent.

The juvenile court took jurisdiction over then four-month-old R.B. (Minor) after sustaining allegations that Ro.B. (Father) perpetrated domestic violence against L.C. (Mother) and Mother was abusing alcohol. The court later terminated reunification services and, ultimately, parental rights. Father, joined by Mother, asks us to decide whether the juvenile court erred in finding he did not establish any of the elements of the parental benefit exception: regular visitation, a substantial positive attachment to Minor, and detriment from terminating parental rights even when balanced against the countervailing benefit of adoption.

## I. BACKGROUND

### A. *Dependency Jurisdiction*

In December 2022, the Los Angeles County Department of Children and Family Services (the Department) received a referral alleging Father engaged in a violent altercation with Mother while she was holding the child. Father and Mother were not residing together at the time. The Department began investigating and removed Minor from parental custody (pursuant to a court order) in January 2023, when Minor was four months old.

That same month, the Department filed a four-count dependency petition alleging Minor was at risk of harm from his parents' domestic violence, from Mother's history of substance abuse including methamphetamine and alcohol (and Father's failure to protect Minor from the same), and because Minor's siblings had previously been declared dependents of the juvenile court due to Mother's substance abuse.

3

The juvenile court later sustained the petition in its entirety at a jurisdiction hearing. The court's disposition order required Father to participate in a full drug and alcohol program; to submit to random and on demand drug and alcohol testing weekly; and to participate in a 52-week domestic violence program, a parenting course, and individual counseling. Father was also granted three, two-hour monitored visits with Minor per week.

B.    *The Ensuing Dependency Proceedings Prior to Termination of Parental Rights*

In late May 2023, when Minor was approximately 8 months old, he was placed with different foster parents and Father's visitation schedule was revised. From June 2023 to February 2024, Father attended roughly half the number of possible visits (not including visits that were canceled or not scheduled due to illness, Father's incarceration, or other extenuating circumstances).

Father was generally attentive to Minor during these visits—playing with him, feeding him, and changing his diaper. There were, however, some instances of inappropriate behavior. For example, during one visit monitored by Minor's foster mother, Father appeared upset every time Minor looked for her. During another visit, Father covered Minor's head and part of his face to prevent Minor from looking at anyone else. Father told Minor that once he came back home, they would move back in with Mother. At one point, Father's tone of voice turned aggressive and his hands were shaking.

In February 2024, the court found there was no substantial probability of Minor reunifying with Mother because she had not

4

consistently contacted or visited Minor, had not made significant progress in resolving problems that led to the proceedings, and had not demonstrated the capacity or ability to complete the objectives of the treatment plan. The court informed Father his services would be extended until late July of the same year, and that if Father wanted to reunify with Minor, he needed to attend his visits and continue to participate in services.

From February to April 2024, Father visited with Minor as allowed by the inpatient drug-treatment program in which he was enrolled. The visits generally went well, but there were some exceptions (similar to the instances of inappropriate behavior that occurred previously). Father was dropped from the inpatient drug program after he tested positive for alcohol in late April.

Father remained fairly consistent with his visits over the following two months, but his visitation dropped off in July and August 2024. During the visits that did occur in this timeframe, Minor was usually happy to see Father when he arrived. Father was attentive to Minor during visits, played with him, and fed him. Minor did not exhibit distress at the end of visits.

Father participated in some of his court-ordered programs. As of July 2024, he completed 24 of 52 domestic violence counseling sessions and completed a 12-week parenting class. He was not participating in individual counseling.

At a review hearing in August 2024, the juvenile court observed that Father had failed out of three outpatient and one inpatient programs and had recently entered a new outpatient program. Though the court recognized Father asserted he was testing negative, he had also missed several tests. The court concluded Father was not establishing a positive bond with

Minor and was not acknowledging or taking care of Minor's special needs. The court stated they were past the 18-month date and there were no grounds to justify extending services. The court accordingly terminated reunification services.

Father's visits became more sporadic thereafter. During the period from September through mid-November, Father had approximately five visits with Minor and missed at least twice that number either because he did not confirm a visit in time or because he canceled a visit. While Father was generally still attentive to Minor during the visits that did occur, he occasionally fell asleep and became unfocused for short periods during visits. Father also had difficulty redirecting Minor's behaviors. During one visit in late October, Minor did not listen to Father and at one point told Father he hated him. Additionally, Father was not attentive to Minor's medical needs. During the proceedings it became clear Minor suffers from epileptic seizures, and Father received guidance on how to react when Minor has a seizure. However, a visit monitor reported that Father did not appear to be aware when Minor was having a seizure.

In November 2024, foster mother told the Department that Minor regresses because of the visits with Father. After visits, Minor usually wanted to be fed even though he was eating more independently, he appeared more needy, and he had a difficult time sleeping at night. It usually took Minor a day to return to his regular self after a visit.

From January through March 2025, Father completed 15 visits and missed around half that number.[1] Minor was aggressive with Father during the visits they had and would hit Father if he was told "no." Minor was happy to see Father when visits began, but, with one exception,[2] he had no problem leaving the visits when they finished.

During the dependency proceedings, Minor was evaluated for muscle tightness, fetal alcohol syndrome, and plagiocephaly. Minor was determined to be developmentally delayed and received feeding therapy, speech therapy, occupational therapy, physical therapy, and early intervention. He showed significant progress in services.

Minor's foster parents were consistent in bringing him to his therapy sessions. He was placed with the foster parents in May 2023, and by September 2023, foster mother said Minor was thriving in the home and she expressed interest in adopting Minor. By early 2025, Minor's foster parents reported they had a great bond and love for Minor and reaffirmed they wanted to provide a permanent home via adoption. They stated that since his placement in their home, they considered him a part of the

---

[1] A Department last minute information report included a statement from the visitation monitor that Father's "'visitation since January of 2025 has been inconsistent, infrequent. He would cancel or not show up. On March 27th, he was scheduled for a visit but he was arrested a few hours later. There was no visitation in April because of that.'"

[2] Minor did become very upset one day when he arrived at the location for the planned visit (the record does not specify where) and Father did not show up.

family. A Department social worker reported Minor looks to foster parents for comfort and to have his needs met, and Minor appears to be happy, active, and healthy in their care.

### C. Father's Request to Change Court Orders

In March 2025, Father filed a Welfare and Institutions Code section 388 petition asking the court to return Minor to his care or change its order terminating his reunification services.[3] The Department opposed the petition and argued Father was not ready to care for Minor and had difficulty bonding with Minor. Elaborating, the Department explained Minor had medical and physical challenges that Father did not appear to understand, Father made an effort during visits with Minor but did not know what to do with him, and Minor did not appear to respond well and listen to Father.

The court held a hearing on Father's section 388 petition in April 2025 and Father testified. He described his visits with Minor in positive terms and asserted he has a strong bond with Minor. Father testified he is the only one there for Minor, Minor always runs to him at the beginning of visits, and Minor waits until Father is packed up and ready to leave at the end of visits so they can leave together.

The court denied Father's section 388 petition, finding both that Father's circumstances were changing but not yet changed and that granting the petition would not be in Minor's best interests.

---

[3]     Undesignated statutory references that follow are to the Welfare and Institutions Code.

### D.    *Termination of Parental Rights*

At the ensuing June 2025 permanency planning hearing, the court admitted a letter from Father into evidence and took judicial notice of Father's testimony from the section 388 petition hearing, including his testimony concerning his bond with Minor.

The Department asked the court to terminate parental rights, maintaining there was no evidence Minor would suffer any harm from ordering termination.  An attorney for Minor agreed with the Department because Mother had been totally absent and Father's visits were inconsistent, because Father lacked protective capacity, and because Father was not familiar with Minor's multiple medical diagnoses.  Father argued he had a bond with Minor and asked the court to forgo terminating parental rights because the parental benefit exception applied.

After reviewing the three elements a parent must establish to successfully invoke the parental benefit exception (consistent visitation, a positive attachment, and detriment from termination (see generally *In re Caden C.* (2021) 11 Cal.5th 614)), the juvenile court found Father had not established any.  The court found Father's visits had been "inconsistent," pointing to Father's attendance at only 7 out of 25 possible visits from August 2024 to the end of the year and several cancelled or unconfirmed visits in 2025.  The court further found that even if Father could establish consistent visitation, the other two elements of the parental benefit exception had not been proven.  The court acknowledged Father loves Minor and there was "a bond to some degree" between the two, but the court found there was no substantial, positive emotional attachment because Father's inconsistency in visiting created an unpredictable environment for Minor and

9

disrupted his sense of stability and emotional security. The court also reasoned terminating the parent-child relationship would not be detrimental to Minor when balanced against the benefits of a new adoptive home in light of Father's occasionally inappropriate behavior during visitation, the observed ill-effects of visits on Minor after visits, and the "great bond" Minor had with foster parents—who had provided a home where he was happy, active, and healthy. The court accordingly ordered parental rights terminated.

## II. DISCUSSION

The juvenile court did not err in deciding the parental benefit exception does not apply. Substantial evidence supports the juvenile court's findings that consistent visitation was lacking and that Minor did not have a substantial positive emotional attachment to Father. There was also no abuse of discretion in the court's determination that severing Father's relationship with Minor, which was premised primarily on sporadic (albeit numerous) visits over a span of over two years, would not be detrimental when considering the many benefits of adoption.

### A.     Legal Framework

If a juvenile court finds by clear and convincing evidence at the section 366.26 hearing that a child is likely to be adopted, "the court shall terminate parental rights and order the child placed for adoption" unless, as relevant here, it "finds a compelling reason for determining that termination would be detrimental to the child due to one or more" enumerated exceptions. (§ 366.26, subds. (c)(1) & (c)(1)(B); see also *Caden C.*, *supra*, 11 Cal.5th at 630-631.) "The statutory exceptions merely

10

permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)

The exception at issue here, the parental benefit exception, applies if "termination would be detrimental to the child" because the parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) A parent invoking the exception in an effort to forestall termination of parental rights bears the burden to demonstrate three things by a preponderance of the evidence. First, the parent must show he or she had "regular visitation and contact with the child, taking into account the extent of visitation permitted." (*Caden C.*, *supra*, 11 Cal.5th at 636.) Second, the parent must show "the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Ibid.*) This element is affected by "'[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Id.* at 632 [in conducting this assessment, "courts often consider how children feel about, interact with, look to, or talk about their parents"].) Third, the parent must show that "terminating that [parental] attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Id.* at 636.) Our review of the juvenile court's ruling on the parental benefit exception is for substantial evidence on the first two of these elements and for abuse of discretion on the third. (*Id.* at 639-640.)

*B.     Analysis*

Father disputes the juvenile court's findings on all three elements of the parental benefit exception.  He maintains (1) his visitation, while not perfect, was regular and beneficial; (2) his bond with Minor, which the juvenile court concluded was not substantial, was strong; and (3) termination of parental rights would be detrimental to Minor because Minor should be provided with as many caring adults supporting him as possible and eliminating Father from that number would be harmful.  His arguments are all unpersuasive.

There is no dispute that Father visited with Minor many times over the two-plus years that dependency proceedings were ongoing.  But the governing statute and controlling case law do not require a certain number of visits, they require "regular" or "consistent" visitation.  (§ 366.26, subd. (c)(1)(B)(i) [exception applies when a parent has, among other things, "maintained regular visitation"]; *Caden C.*, *supra*, 11 Cal.5th at 632 ["The first element—regular visitation and contact—is straightforward.  The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders'"].)  Under the deferential standard of review that applies, there is no basis to disturb the juvenile court's finding that Father's visits were neither regular nor consistent.  The record shows there were months when Father only had a handful of visits with Minor though no extenuating circumstances prevented visitation.

Substantial evidence also supports the juvenile court's conclusion Father had not established "a substantial, positive, emotional attachment to [Father]—the kind of attachment implying that the child would benefit from continuing the relationship."  (*Caden C.*, *supra*, 11 Cal.5th at 636.)  At the time

12

Minor was removed from Father's custody, he was four months old; by the time the court terminated Father's parental rights, Minor was almost three. Although there were periods when Father visited Minor frequently, and Minor was generally happy to see Father when visits commenced, Minor and Father's interactions demonstrated increasing levels of strife over the course of the proceedings. Minor did not listen to Father when Father told him to refrain from certain behaviors and would hit Father to show his displeasure. Additionally, Minor had no difficulty separating from Father at the end of visits, and there is no indication Minor asked for Father when he was not present or when he missed a visit—with the exception of the one time when Minor was very upset because Father failed to appear for a visit. All this supported the juvenile court's conclusion that Father's bond was not substantial enough to satisfy this requirement.

Additionally, the juvenile court did not abuse its discretion when it determined terminating the parental relationship would not be detrimental when balanced against the benefit of a new adoptive home. Minor had been in foster care since he was four months old and had been with his current foster parents (the prospective adoptive parents) since he was approximately eight months old—meaning he had lived with them slightly more than two years at the time of the permanency planning hearing. Minor's prospective adoptive parents treated him like a member of their family and were attentive to his varied medical needs. He was healthy and happy in their care. Additionally, though there was evidence Minor was happy to see Father during visits, there was also evidence he struggled with the more recent (and more sporadic) visits—regressing in feeding patterns and having trouble sleeping. With scant evidence that severing Minor's bond

with Father would be detrimental, and strong evidence Minor's foster parents were providing him with safety and security, the juvenile court did not abuse its discretion in deciding that terminating Father's parental rights would not be detrimental.

DISPOSITION

The juvenile court's orders are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, J.

We concur:

HOFFSTADT, P. J.

KIM (D.), J.